**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER HUFFMAN,** | : | |
| | : | |
| Plaintiff, | : | Case No. 2:24-cv-04073-EAS-KAJ |
| | : | |
| v. | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| **CITY OF COLUMBUS,** | : | Magistrate Judge Kimberly A. Jolson |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, the City of Columbus moves this Court for an Order granting Defendant summary judgment on each of Plaintiff's claims. A memorandum in support is attached hereto and incorporated herein.

Respectfully submitted,

**CITY OF COLUMBUS, DEPARTMENT OF LAW**
**ZACH KLEIN, CITY ATTORNEY**

/s/ Leigh B. Joyce
Paul M. Bernhart (0079543) – Trial Counsel
Leigh B. Joyce (0099821)
Assistant City Attorneys
77 North Front Street, 4th Floor
Columbus, OH  43215
(614) 645-7385 phone
(614) 645-6949 fax
pmbernhart@columbus.gov
lbjoyce@columbus.gov

*Counsel for Defendant City of Columbus*

**MEMORANDUM IN SUPPORT**

## I.  INTRODUCTION

Plaintiff Christopher Huffman was employed by the City of Columbus, Department of Public Safety (the "Department"), Division of Police (the "Division"), as a police officer until his voluntary resignation on June 5, 2024. Plaintiff subsequently filed this lawsuit against the City alleging claims for disability discrimination, hostile work environment, and constructive discharge. However, Plaintiff's claims necessarily fail because he did not engage in the ADA interactive process with the City and there is no evidence to support his claim that he was subjected to a hostile work environment or threatened with termination. Given these undisputed facts, the City is entitled to judgment as a matter of law.

## II.  BACKGROUND AND FACTS

Plaintiff started his employment with the City on December 12, 2022, when he joined the Columbus Police Academy. (Deposition of Plaintiff Christopher Huffman ("Pl.'s Dep."), 19:22-20:1.) Plaintiff's employment with the City was subject to a probationary period, which was to be completed July 11, 2024. (Pl.'s Dep. Ex. A, p. 1.) Throughout his employment with the City, Plaintiff was a member of the Fraternal Order of Police, Capital City Lodge No. 9 (the "Union"). (Pl.'s Dep., 18:19-19:1.) Plaintiff attended the Academy for approximately seven months and graduated with the 141st Class on July 14, 2023. (Pl.'s Dep., 20:2-11.)

After graduating from the Academy, Plaintiff went through four phases of field training. (Pl.'s Dep., 32:11-17.) During field training, probationary officers take on basic patrol tasks, such as conducting traffic stops and responding to calls for service. (Pl.'s Dep., 37:23-38:6.) Probationary officers are paired with field training officers, who observe probationary officers' work and document issues that arise concerning their performance. (Pl.'s Dep., 38:7-22.) In the event the field training officer notices issues regarding a probationary officer's performance, the

2

field training officer discusses those issues with the probationary officer. (Pl.'s Dep., 38:23-39:2.) To move on from field training, a probationary officer's Phase 4 field training officer must pass him or her. (Pl.'s Dep., 40:14-20.)

### A.  Plaintiff's Performance Issues and Resignation

Plaintiff underperformed during his time in field training and had one of the highest numbers of unacceptable grades in his class. (Deposition of Sergeant Charles Parker ("Parker Dep."), 14:3-8.) During Phase 1, Plaintiff had 19 unacceptable ratings, including three for missing items during prisoner searches. (Pl.'s Dep. Ex. G, pp. 1-3.) In Phase 2, Plaintiff's field training officer noted 26 issues regarding Plaintiff's performance. (Pl.'s Dep. Ex. G, pp. 4-12.) Those issues included Plaintiff missing a gun during a pat down, driving around for two hours and failing to make a traffic stop despite the field training officer observing five separate traffic violations, and crashing his cruiser into a concrete block. (Pl.'s Dep. Ex. G, pp. 4-5, 7.)

During Phase 3, Plaintiff had at least six unacceptable ratings and numerous instances where his poor performance was noted. (Pl.'s Dep. Ex. G, pp. 12-17.) Several of these unacceptable ratings related to incidents where Plaintiff exhibited unsafe practices, such as escorting a handcuffed prisoner on Plaintiff's gun side, parking with his back facing a potential threat, failing to alert other officers to the presence of a firearm, and failing to immediately secure a firearm to render a situation safe. (Pl.'s Dep. Ex. G, pp. 13-14.) Plaintiff also missed an object when conducting a pat down, as he had done in the prior phases. (Pl.'s Dep. Ex. G, p. 14.)

Plaintiff's performance issues continued into Phase 4. (Pl.'s Dep. Ex. G, pp. 17-23.) On one occasion, Plaintiff conducted a traffic stop on a bicyclist, asked for their date of birth and social security number, but did not write any of the information provided down. (Pl.'s Dep. Ex. G, p. 19.) When he returned to his cruiser to look up the individual, he provided records with the incorrect date of birth and social security number. (Pl.'s Dep. Ex. G, p. 19.) Additionally, on

several occasions, Plaintiff seemed unable to read a map correctly or was otherwise unaware of his location. (Pl.'s Dep. Ex. G, pp. 19-22.) Ultimately, Plaintiff's Phase 4 field training officer, Larry Whitman, did not pass Plaintiff and recommended his termination from the Division of Police. (Pl.'s Dep., 41:2-4; Pl.'s Dep. Ex. H.) According to Officer Whitman and as exemplified in his field training records, Plaintiff did not respond to training and was unable to function effectively as a new one-officer unit. (Pl.'s Dep. Ex. H.)

Nevertheless, Plaintiff moved on from field training. (Pl.'s Dep. 44:1-3.) Plaintiff's first assignment after field training was 15C. (Pl.'s Dep., 44:18-20.) Plaintiff's next assignment was Zone 3, Evening Mid-Watch, under Sergeant Autumn Hamrick. (Pl.'s Dep. 45:16-21.) Since Plaintiff was still a probationary officer, Sergeant Hamrick was not his direct supervisor. (Deposition of Sergeant Autumn Hamrick ("Hamrick Dep."), 19:12-13.) However, Sergeant Hamrick was charged with documenting Plaintiff's performance and deficiencies. (Hamrick Dep., 19:14-15.) If Sergeant Hamrick determined there were any deficiencies with Plaintiff's performance, she was required to notify his chain of command, which was the Field Training Office. (Hamrick Dep., 19:16-18.)

Plaintiff continued to have performance issues while in Zone 3, Evening Mid-Watch, including trouble completing OVI reports or cases properly. (Hamrick Dep., 13:13-15.) As a result, Sergeant Hamrick had a field training officer review the OVI packets with Plaintiff and instructed Plaintiff to have his OVI reports reviewed by his sergeant. (Hamrick Dep., 13:15-16, 24:2-4.) In one instance on or around March 31, 2024, Plaintiff "messed up an OVI." (Pl.'s Dep., 46:16.) It was one of Sergeant Hamrick's days off and Plaintiff texted her to ask if he could have a field training officer review an OVI packet. (Hamrick Dep., 24:22-23.) With Sergeant Hamrick previously instructing Plaintiff to have OVI reports reviewed by his sergeant, Sergeant Hamrick

4

thought Plaintiff was asking if the field training officer could review the OVI packet before he sent it to a sergeant for review. (Hamrick Dep., 24:23-25:1.) Yet, instead of having a sergeant review the packet as Sergeant Hamrick instructed, Plaintiff submitted the packet to the court with only having a field training officer review it. (Hamrick Dep., 25:1-4; Pl.'s Dep., 52:16-53:9.) Upon review, Sergeant Hamrick noticed several errors in the report. (Hamrick Dep., 25:4-6.) Specifically, Plaintiff did not identify a victim, did not articulate all elements of the crimes with which the suspect was charged, and incorrectly stated that the suspect was arrested. (Pl.'s Dep. Ex. I, p. 2.)

Sergeant Hamrick reminded Plaintiff that "a sergeant needed to review [his] arrest report[s] before" turning them in. (Pl.'s Dep. Ex. I, p. 1.) Sergeant Hamrick told Plaintiff that she would "be discussing [his] lack of progression regarding documentation with" his sergeant and stated that he "would benefit from additional training pertaining to report writing." (Pl.'s Dep. Ex. I, p. 1.) Sergeant Hamrick spoke with Plaintiff's direct supervisor, then-Sergeant (now Lieutenant) April Redick, about Plaintiff's performance deficiencies. (Hamrick Dep., 27:6-8.) At that time, Lieutenant Redick was the sergeant over the probationary officers. (Deposition of Lieutenant April Redick ("Redick Dep."), 6:24-7:18.) Sergeant Hamrick and then-Sergeant Redick determined that Plaintiff would benefit from remedial training. (Hamrick Dep., 27:8-9.)

On April 14, 2024, Sergeant Hamrick emailed then-Sergeant Redick a request for remedial training for Plaintiff. (Hamrick Dep. Ex. 1.) In this request, Sergeant Hamrick detailed Plaintiff's work performance deficiencies requiring remedial training. (Hamrick Dep. Ex. 1.) In addition to the OVI packet issue, Sergeant Hamrick noted that, on several occasions, she was unable to approve reports authored by Plaintiff because of numerous errors. For instance, Plaintiff charged two individuals with child endangerment, but did not complete a case report, an arrest report, or a

probable cause affidavit. (Hamrick Dep. Ex. 1, p. 4.) In addition to not having a sergeant review his OVI packet, Plaintiff also stated that the individual ran a red light and crossed a double-yellow line. (Hamrick Dep. Ex. 1, p. 6.) However, when Sergeant Hamrick reviewed the cruiser video system ("CVS") footage, it "clearly show[ed] the violator had a green light, and did not cross a double yellow." (Hamrick Dep. Ex. 1, p. 6.) Sergeant Hamrick noted that Plaintiff "did not review the CVS footage to assist him with writing his arrest report." (Hamrick Dep. Ex. 1, p. 6.)

As a result of the multitude of issues Sergeant Hamrick identified, Plaintiff was ordered to participate in 16 hours of remedial report writing training from April 8 to April 19, 2024. (Pl.'s Dep. Ex. J, p.1.) Through this training, Plaintiff was required to complete several written scenarios, including completing a probable cause affidavit, criminal complaints, a parking citation, a traffic citation, and a use of force report. (Pl.'s Dep. Ex. J, p. 1.) After having sustained an injury on or about March 30, 2024, and upon completing remedial training, Plaintiff was transferred to the administration office, colloquially called "580." (Pl.'s Dep., 67:17-68:12; Pl.'s Dep. Ex. L, p. 2.) Plaintiff remained at 580 until his resignation on June 5, 2024. (Pl.'s Dep., 67:13-15.)

On April 23, 2024, then-Sergeant Redick sent an intra-divisional memorandum to Chief Elaine Bryant notifying her of Plaintiff not performing at an acceptable level. (Pl.'s Dep. Ex. L.) Therein, then-Sergeant Redick informed Chief Bryant that Sergeant Hamrick raised concerns about Plaintiff's ability to process, retain, and document information. (Pl.'s Dep. Ex. L, p. 1.) Then-Sergeant Redick noted that Sergeant Hamrick advised her that Plaintiff has exhibited a pattern of deficiencies in report writing and has been completing reports and paperwork inaccurately and incorrectly. (Pl.'s Dep. Ex. L, p. 1.) Yet, despite Sergeant Hamrick ordering Plaintiff to refer to his Field Report Manual and other manuals as necessary when completing reports, Plaintiff continued to inaccurately complete police reports. (Pl.'s Dep. Ex. L, p. 1.) And

when then-Sergeant Redick asked Plaintiff why he continued to make the same errors after being corrected and ordered to use his resources, Plaintiff replied, "I forget." (Pl.'s Dep. Ex. L, p. 2.) Then-Sergeant Redick explained to Plaintiff that being incapable of remembering a direct order is unacceptable and it is significantly important to correctly document information on police reports. (Pl.'s Dep. Ex. L, p. 2.) Due to Plaintiff's inability to remember basic patrol tasks, then-Sergeant Redick became concerned about his fitness for duty. (Pl.'s Dep. Ex. L, p. 2.)

In May 2024, April Redick was promoted to the position of Lieutenant and Sergeant Charles Parker became the probationary unit sergeant. (Redick Dep., 20:6-9.) On June 5, 2024, Plaintiff was medically cleared to return to his shift. (Pl.'s Dep., 128:6-8.) Around that date, Plaintiff spoke with Sergeant Parker concerning his deficient performance, which Plaintiff himself acknowledged. (Parker Dep., 8:10-22; 12:17-13:5.) During this conversation, Sergeant Parker notified Plaintiff that he would not be returning to the street at that time. (Parker Dep., 8:2-16.) Sergeant Parker did not tell or advise Plaintiff to resign, nor did Sergeant Parker discuss resignation. (Parker Dep., 8:23-9:4.)

That same day, Plaintiff submitted his resignation, to be effective June 19, 2024. (Pl.'s Dep. Ex. R.) At some point, Plaintiff brought his resignation letter to Sergeant Parker and told Sergeant Parker that, since he was not being released back to the street, Plaintiff believed he would be terminated and thought a resignation would look better than a termination. (Parker Dep., 9:5-16.) In response, Sergeant Parker told Plaintiff that he was not aware that Plaintiff was going to be terminated or recommended for termination. (Parker Dep., 9:17-20, 13:18-20.) At the time, Sergeant Parker was only aware of the memorandum from then-Sergeant Redick to Chief Bryant detailing Plaintiff's poor performance. (Parker Dep., 9:23-10:3.)

7

On June 7, 2024, Yarshar Kermue, Human Resources Analyst for the Division of Police, sent Plaintiff the Public Safety Director's resignation acceptance letter. (Pl.'s Dep. Ex. S.) Shortly thereafter, Plaintiff participated in an exit interview with Ms. Kermue. (Pl.'s Dep., 134:15-19.) When Ms. Kermue asked Plaintiff why he resigned, he "was told that there was a packet that [he] had not seen and no one [would] show [him] what it is or tell [him] what's in it, supposedly that's going to get [him] fired." (Pl.'s Dep., 134:22-135:9.)

On June 10, 2024, Plaintiff submitted a discrimination complaint to the City. (Pl.'s Dep. Ex. U.) In the complaint, Plaintiff stated that he believed he was being discriminated against after two sergeants found out he had a traumatic brain injury. (Pl.'s Dep. Ex. U, p. 2.) He also stated that he "resigned to be able to possibly be a police officer somewhere else," and that he "resigned to protect [himself] from termination." (Pl.'s Dep. Ex. U, pp. 2, 4.) Plaintiff did not indicate in therein that he was encouraged to resign. (Pl.'s Dep. Ex. U.)

Allison Lippman, the then-Assistant Director of EEO Compliance, investigated Plaintiff's discrimination complaint. (Hamrick Dep. Ex. 9.) After interviewing Plaintiff, Sergeant Hamrick, Lieutenant Redick, and Officer Wesley Williams, and reviewing documentary evidence, Ms. Lippman determined that there was not a preponderance of the evidence to support Plaintiff's allegations. (Hamrick Dep. Ex. 9, pp. 1, 10.) During his interview with Ms. Lippman on June 13, 2024, Plaintiff indicated that he wanted to try to rescind his resignation. (Hamrick Dep. Ex. 9, p. 5.) Ms. Lippman told Plaintiff that he should try to do so before his last day of employment. (Hamrick Dep. Ex. 9, p. 5.) That same day, Plaintiff asked to withdraw his resignation and be reinstated. (Pl.'s Dep. Ex. T.) Ultimately, however, Plaintiff's request to rescind his resignation was not accepted and his last day of employment with as a City of Columbus Police Officer was June 19, 2024. (Pl.'s Dep., 148:3-6.)

On June 13, 2024, Sergeant Parker sent an intra-divisional memorandum to Chief Bryant summarizing Plaintiff's deficient performance. (Pl.'s Dep. Ex. M.) Like Lieutenant Redick, Sergeant Parker detailed Plaintiff's performance issues, noting Plaintiff performed below the average of the rest of his recruit class throughout most of his training. (Pl.'s Dep. Ex. M, p. 2.) Sergeant Parker did not recommend Plaintiff's termination. (Parker Dep., 14:17-20; Pl.'s Dep. Ex. M, pp. 1-2.)

### B.  Plaintiff's Medical Conditions and the ADA Process

On the night of March 22 or the morning of March 23, 2024, when Sergeant Hamrick did a ride along with him, Plaintiff disclosed to her that he had certain medical conditions. (Hamrick Dep., 14:3-6, 14:17-22, 15:5-6, 16:12-13.) In response, Sergeant Hamrick asked Plaintiff if he was okay and if he needed anything. (Hamrick Dep., 14:20-23.) Sergeant Hamrick informed Plaintiff that she was a member of the Peer Assistance Team and that she could connect him with someone on the team. (Hamrick Dep., 15:7-15.) Plaintiff responded that he did not need a connection with the Peer Assistance Team and was already getting assistance from the Employee Assistance Program ("EAP"). (Hamrick Dep., 15:16-18.) Plaintiff did not ask if any changes could be made or for any extra help. (Hamrick Dep., 18:10-12.) Despite having performance issues relating to report writing, Plaintiff never asked Sergeant Hamrick for extra time for report writing nor told her that these issues were due to his medical conditions. (Hamrick Dep., 18:16-19.)

As a result of Plaintiff disclosing his medical conditions to her, Sergeant Hamrick notified then-Sergeant Redick of this disclosure. (Hamrick Dep., 19:20-20:7; Redick Dep., 12:16-25.) Then-Sergeant Redick, in turn, notified her lieutenant at the time, Lieutenant Mark Dopp, that Plaintiff disclosed medical conditions. (Redick Dep., 13:5-10.) On April 22, 2024, Lieutenant Dopp informed Human Resources that Plaintiff mentioned he has a medical issue that hinders his ability to perform his police duties. (Hamrick Dep. Ex. 2.)

The very next day, Kristina Alcon, Payroll Benefits Clerk and member of the Human Resources team, reached out to Plaintiff to begin the interactive process. (Hamrick Dep. Ex. 3, pp. 4-5.) Ms. Alcon provided Plaintiff with the City's Employee Accommodation Request Form and provided Plaintiff with instructions to complete the form. (Hamrick Dep. Ex. 3, p. 5.) Sometime between April 23rd and April 26th, Ms. Alcon spoke to Plaintiff over the phone. (Deposition of Kristina Alcon ("Alcon Dep."), 16:11-13.) In that conversation, Plaintiff asked Ms. Alcon who originated the request. (Alcon Dep., 16:20-22.) Ms. Alcon, however, was not aware of who originated the request. (Alcon Dep., 16:23-17:1.) However, after their discussion, Ms. Alcon researched potential accommodations and provided those to Plaintiff. (Hamrick Dep. Ex. 3, pp. 3-4.) Ms. Alcon also reminded Plaintiff that the process was confidential and that he cannot be punished for seeking out or obtaining a reasonable accommodation. (Hamrick Dep. Ex. 3, p. 4.) On April 30, 2024, Plaintiff responded with some of the impacts of his medical condition, including memory loss, organizing, and planning. (Hamrick Dep. Ex. 3, p. 3.) On May 1, 2024, Ms. Alcon provided a list of suggestions for memory loss, organizing, and planning. (Hamrick Dep. Ex. 3, pp. 2-3.) On May 3, 2024, Plaintiff indicated that some of the suggestions may benefit him. (Hamrick Dep. Ex. 3, p. 2.)

After not hearing back from Plaintiff, Ms. Alcon reached out to Plaintiff on May 17, 2024. (Hamrick Dep., Ex. 3, p. 2.) Ms. Alcon also provided Plaintiff with a deadline of May 23, 2024, to complete and return the accommodation paperwork to be able to provide reasonable accommodations to Plaintiff. (Hamrick Dep. Ex. 2, p. 2.) On May 20, 2024, Plaintiff responded, asking whether Ms. Alcon was sure that completing the reasonable accommodation paperwork would not affect him being a patrol officer. (Hamrick Dep. Ex. 2, p. 1.) In response, Ms. Alcon stated that she did not believe that he would be taken off patrol based on his requests. (Hamrick

10

Dep. Ex. 2, p. 1.) On May 22, 2024, Plaintiff advised Ms. Alcon that he would get the paperwork filled out and sent to her. (Hamrick Dep. Ex. 2, p. 1.) Yet, Plaintiff never returned the reasonable accommodation request paperwork. (Pl.'s Dep., 114:11-115:18.) As a result, Ms. Alcon could not move forward with the accommodation process. (Alcon Dep., 25:15-20.) Plaintiff did not otherwise request a disability accommodation during his employment with the City. (Pl.'s Dep. 43:17-22, 98:17-21, 117:24-118:3, 121:13-123:6.)

## III.   LAW AND ARGUMENT

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is proper against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party is entitled to judgment as a matter of law if the nonmoving party fails "to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* (quoting *Anderson*, 477 U.S. at 250).

### B.  Plaintiff failed to engage in the interactive process.

For his claims for violation of the Americans with Disabilities Act (ADA), Plaintiff bears the initial burden of establishing a prima facie case. To set forth a prima facie case of disability discrimination based on an employer's alleged failure to accommodate, the plaintiff must establish that: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had

11

reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the plaintiff was replaced. *Smith v. Towne Properties Asset Mgt. Co.*, No. 1:17-cv-523, 2019 U.S. Dist. LEXIS 248718, at \*18-19 (S.D. Ohio June 20, 2019) (citing *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011) and *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016)). "A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633-34 (6th Cir. 1998)).

Here, Plaintiff alleges that the City violated the ADA by failing to provide reasonable accommodations to him for and subjecting him to discriminatory treatment based on his disability. (Compl., ¶ 23 (Doc. 1).) While the City initiated and attempted to engage in the interactive process with Plaintiff to provide him with reasonable accommodations, Plaintiff failed to engage in the process. Ms. Alcon reached out to Plaintiff on numerous occasions to discuss potential accommodations, even providing Plaintiff with a deadline to return his completed ADA accommodation request form. (Hamrick Dep. Ex. 3.) But Plaintiff failed to respond after May 22, 2024, did not return the ADA accommodation request form, and did not inform Ms. Alcon of his purported upcoming appointment or otherwise respond to this communication. (Hamrick Dep. Ex. 3; Pl.'s Dep., 114:11-115:18; Alcon Dep., 23:17-24:12.)

Despite his contention that the City knew he had a medical appointment with the Columbus Veterans Affairs Medical Clinic, Plaintiff only has his self-serving testimony to support this allegation. (Pl.'s Dep., 104:11-12, 105:9-14.) Of course, "[t]he absence of additional evidence to support a party's position beyond his own self-serving testimony is insufficient to overcome a

motion for summary judgment." *Britenriker v. Mock*, No. 3:08-cv-1890, 2009 U.S. Dist. LEXIS 66478, at *14 (N.D. Ohio July 31, 2009) (citing *Bryant v. Mahoning County Bd. of Comm'rs*, No. 4:05-cv-2783, 2007 U.S. Dist. LEXIS 42936, at *7 (N.D. Ohio Jun. 13, 2007)); see also *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1994). Even though Plaintiff communicated with Ms. Alcon via email about the accommodation process, there is no email correspondence wherein Plaintiff advises Ms. Alcon of his alleged upcoming medical appointment. (Hamrick Dep., Ex. 3.) Plaintiff cannot point to a single piece of evidence that supports his assertion that he continued to engage in the interactive process after May 22, 2024. Therefore, Plaintiff cannot prevail on a claim of disability discrimination.

### C. Plaintiff was not subjected to harassment.

Just as there is no evidence to support his claim for disability discrimination aside from his self-serving testimony, there is no evidence to support Plaintiff's allegation that Defendant created and maintained a hostile work environment based on Plaintiff's disability.

To establish a claim for a hostile work environment under the ADA, Plaintiff must show that (1) he was disabled, (2) he was subject to unwelcome harassment, (3) the harassment unreasonably interfered with his work performance, and (5) the City knew or should have known about the harassment and failed to take corrective action. *Rafferty v. Giant Eagle Mkts., Inc.*, No. 2:17-cv-617, 2018 U.S. Dist. LEXIS 186643, at *20-21 (S.D. Ohio Oct. 31, 2018) (quoting *Trepka v. Bd. of Educ.*, 28 Fed. Appx. 455, 460-61 (6th Cir. 2002)). The record is devoid of any indication that Plaintiff was subject to unwelcome harassment or that any alleged harassment unreasonably interfered with his work performance.

"Conduct that can form the basis for a hostile work environment claim must be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment.'" *Rafferty v. Giant Eagle Mkts., Inc.*, No. 2:17-cv-617, 2018 U.S. Dist.

13

LEXIS 186643, at *21 (S.D. Ohio Oct. 31, 2018) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). Of course, the "'ADA is not 'a general civility code for the American workplace" and "is not meant to prevent every comment that an employee might find offensive." *Mance v. Malco Prods., Inc.*, No. 5:16-cv-1721, 2016 U.S. Dist. LEXIS 135740, at *2 (N.D. Ohio Sept. 30, 2016) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) and *Alsept v. Honda of Am. Mfg.*, No. 3:11-cv-395, 2013 U.S. Dist. LEXIS 77530, at *5 (S.D. Ohio June 3, 2013)). In considering whether conduct can support a hostile work environment action, the factfinder takes into consideration several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Plaintiff pointed to a few examples of what he alleges constitute an abusive working environment. For instance, Plaintiff alleged that, on a single occasion, Sergeant Hamrick made a joke that he had must have written a news article, as there were some misspellings and grammar issues. (Pl.'s Dep., 84:14-21.) Plaintiff further alleged that when he confronted Sergeant Hamrick about this "joke," she told him "to get tough skin. We're just trying to make you part of the family." (Pl.'s Dep., 84:21-85:5.) Plaintiff provided no other examples of Sergeant Hamrick or any other person creating or maintaining a hostile work environment.

Nevertheless, Plaintiff testified that Sergeant Hamrick told him to let her know if he needs anything regarding his medical conditions. (Pl.'s Dep., 84:9-13.) Plaintiff further testified that Sergeant Hamrick told him "that [he] was great -- [he] was doing a great job, that she doesn't hand out compliments very often, that [he] was more than welcome back to Zone 3, evening mid-watch, after [his] probationary stuff was over." (Pl.'s Dep. 47:10-16.) Such compliments from the

14

purported bad actor do not indicate a hostile work environment existed.

Moreover, Sergeant Hamrick testified that she did not tell Plaintiff that he would not get special treatment or needed to have tougher skin, or make jokes about Plaintiff having a bruise on his brain or having written a news article. (Hamrick Dep., 21:19-22:14.) Even if she did make such "jokes" or say these things to Plaintiff, which she did not, they cannot support a claim for hostile work environment. There is no indication that the alleged comments were severe, threatening, or humiliating. Nor is there any indication that any alleged statements interfered with Plaintiff's work performance or were made with any frequency. Therefore, Plaintiff cannot succeed on a claim of hostile work environment under the ADA.

### D.  Plaintiff was not threatened with termination.

Finally, Plaintiff cannot establish a claim for constructive discharge. To constitute a constructive discharge claim, working conditions must be so '"unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."' *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982) (citing *Bourque v. Powell Elec. Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980)). To prevail on such a claim, Plaintiff must establish (1) the existence of intolerable working conditions, and (2) an intent by Defendant to force the employee to quit. *Bourne v. Provider Servs. Holdings, LLC*, No. 1:12-cv-935, 2019 U.S. Dist. LEXIS 76959, at *13-14 (S.D. Ohio May 7, 2019). Plaintiff cannot establish either element.

Plaintiff alleges that Defendant's refusal to provide accommodations, combined with the allegedly hostile work environment and threat of termination, left Plaintiff with no choice but to resign. Yet, Defendant never refused to provide Plaintiff with accommodations. It was Plaintiff who failed to engage in the interactive process by not communicating with Ms. Alcon or returning his ADA accommodation paperwork. (Hamrick Dep. Ex. 3; Pl.'s Dep., 114:11-115:18; Alcon Dep., 23:17-24:12.) Additionally, as described above, there is no support for Plaintiff's allegation

15

of a hostile work environment.

Furthermore, there is no indication that Plaintiff was threatened with termination or that Defendant intended Plaintiff to quit. Instead, Plaintiff resigned because he thought he was going to get fired. (Pl.'s Dep., 134:22-135:9; Pl.'s Dep. Ex. U, p. 4.) Plaintiff stated that Sergeant Parker advised him that a packet was submitted through his chain of command and that he would be taken off the street and probably terminated based on the information in the packet. (Pl.'s Dep. 129:5-10.) Yet, Plaintiff also testified that neither he nor Sergeant Parker knew what was in the packet. (Pl.'s Dep. 129:11-14, 131:11-16.) Sergeant Parker testified that he did not tell or advise Plaintiff to resign, nor did they discuss resignation. (Parker Dep., 8:23-9:4.) Sergeant Parker was not even aware that Plaintiff was going to be terminated or recommended for termination. (Parker Dep., 9:17-20, 13:18-20.) Like Sergeant Parker, Lieutenant Redick and Sergeant Hamrick were not aware of any probationary termination request relating to Plaintiff. (Redick Dep., 29:13-15; Hamrick Dep., 49:14-17, 50:13-16, 59:19-23.) Therefore, Plaintiff cannot prevail on a claim of constructive discharge and his claim fails as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, Defendant City of Columbus respectfully requests that this Court enter an order granting it summary judgment, dismissing Plaintiff Christopher Huffman's Complaint in its entirety, and assessing costs to Plaintiff.

16

Respectfully submitted,

**CITY OF COLUMBUS, DEPARTMENT OF LAW**
**ZACH KLEIN, CITY ATTORNEY**

/s/ Leigh B. Joyce
Paul M. Bernhart (0079543) – Trial Counsel
Leigh B. Joyce (0099821)
Assistant City Attorneys
77 North Front Street, 4th Floor
Columbus, OH  43215
(614) 645-7385 phone
(614) 645-6949 fax
pmbernhart@columbus.gov
lbjoyce@columbus.gov

*Counsel for Defendant City of Columbus*

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, I electronically filed the foregoing *Defendant City of Columbus's Motion for Summary Judgment* with the Court using the Court's CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court's CM/ECF system.

/s/ Leigh B. Joyce
Leigh B. Joyce (0099821)
Assistant City Attorney

17